2077

SKULL CREEK CLUB LIMITED PARTNERSHIP and White Star Associates, Inc., Appellants v. COOK AND BOOK, INC.; Rick Stone and Deborah Stone, Respondents.

(437 S.E. (2d) 163)

Court of Appeals

*William R. Phipps*, of *Bethea, Jordan & Griffin*, Hilton Head Island, *for appellants.*

*Curtis L. Coltrane*, of *Wilson & Coltrane*, Hilton Head Island, *for respondents*

Heard Sept. 8, 1993.

Decided Oct. 4, 1993. Reh. Nov. 10, 1993.

CURETON, Judge:

Skull Creek Club Limited Partnership and White Star Associates, Inc. (hereinafter "landlords") filed an Application for Eviction alleging that Cook and Book, Inc, Rick Stone and Deborah Stone (hereinafter "tenants") had breached the the terms of a written lease. The trial court found in favor of tenants. We affirm.

Landlords are owners of the Skull Creek Marina located on Hilton Head Island. Tenants leased the property pursuant to the terms of a written lease dated July 30, 1990 for the purpose of operating a restaurant and lounge.

Landlords claimed the tenants breached the lease in several ways. Each of the alleged breaches related to defaults in the payment of money under the lease. The tenants argued that all amounts due under the terms and conditions of the lease had been paid.

The landlords claimed that the following amounts were due:

| | | |
|---|---|---|
| (1) | Pro Rata Real Property Taxes | $1,103,38 |
| (2) | Pro Rata Utility and Service Costs | $1,358.62 |
| (3) | Insurance Costs | $ 666.00 |
| (4) | Monthly Rental | $4,127.45 |
| | TOTAL | — $7,255.45 |

## I.

As relates to the claim for a pro rata share of real property taxes, the lease states that "Tenant shall pay to Landlord, as additional rent, hereunder all real estate taxes, special assessments, personal property taxes, and property owners assessments levied or assessed against *the Property* during the term of the lease." (Emphasis added.) The property is described as, "[t]he premises as reflected on the attached Exhibit "A" ("Real Property"). . . ."[1]

---

[1] There were two pages labeled Exhibit "A" attached to the lease. The first page of Exhibit "A" is a site plan of a portion of the Skull Creek Marina property which depicts the building where the respondents' restaurant is located. The second page of Exhibit "A" is a site plan showing a parking lot which is contiguous to the parcel shown on the first Exhibit "A."

The landlords argue that the lease clearly and unambiguously describes the demised premises and requires tenants to pay a pro rata share of the real property taxes on the entire property shown on both pages of Exhibit "A" to the lease, including the parking lot. Tenants contend that since they only leased a portion of the building depicted on the first page of Exhibit "A," they were not required to pay a pro rata portion of expenses related to the remainder of the property shown on the second page of Exhibit "A."

Exhibit "A" and the description of the leased "Property" arguably indicate that tenants leased the entire property depicted in Exhibit "A," including the parking lot. However, other parts of the lease arguably indicate that tenants only leased approximately two-thirds of the building shown on page one of Exhibit "A." Therefore, to the extent that exhibit "A" purports to show the demised premises, it conflicts with other portions of the lease. As a result, the trial court found that an ambiguity was present.[2] We agree.

The construction of a contract which is ambiguous, or capable or more than one construction, is a question of fact. *Cafe Associates, Ltd. v. Gerngross*, 305 S.C. 6, 406 S.E. (2d) 162 (1991); *Peeples v. South Carolina Power Co.*, 166 S.C. 150, 164 S.E. 605 (1932); 17A C.J.S. *Contracts* § 611 (1963). As with any other contract, the duty of the court in construing a lease is to determine the intention of the parties at the time the lease was made. *Price v. Derrick*, 262 S.C. 341, 204 S.E. (2d) 389 (1974). In arriving at the intention of the parties, the lease must be construed as a whole and different provisions dealing with the same subject matter are to be read together. *Wise v. Picow*, 232 S.C. 237, 101 S.E. (2d) 651 (1958).

Moreover, a lease is to be construed more strongly against the lessor, and in favor of the lessee, particularly where the lease was prepared by the lessor. Thus, where the lease admits of two constructions, either of which is reasonable, the one more favorable to the lessee must be adopted. 49 Am. Jur. (2d) *Landlord and Tenant* § 143 (1970).

Since an action for ejectment is one at law, *Rogers v. Nation*, 284 S.C. 330, 326 S.E. (2d) 182 (Ct. App. 1985), as is an action for breach of contract, *Airfare, Inc. v.*

[2] We recognize that the trial court's ruling on the ambiguity issue at trial appears to differ from his holding on the issue in his order.

*Greenville Airport Comm.*, 249 S.C. 265, 153 S.E. (2d) 846 (1967), the findings of fact of the judge will not be disturbed unless found to be without evidentiary support. *Townes Associates, Ltd. v. City of Greenville*, 266 S.C. 81, 221 S.E. (2d) 773 (1976); *American Federal Bank, F.S.B. v. White*, 296 S.C. 165, 370 S.E. (2d) 923 (Ct. App. 1988). The rule is the same whether the judge's findings are made with or without a reference. *Id.*

We hold there is some evidentiary support in the record for the trial court's conclusion that only those portions of the building used by the tenants were to be considered the demised premises, and the terms of the lease did not require tenants to pay taxes on the entire property depicted in Exhibit "A."[3]

## II.

Landlords argues the court erred in excluding the testimony of their former attorney, Mr. Smoot, who negotiated and partially drafted the lease agreement. They claim they have been prejudiced by the exclusion of this testimony which would have detailed the negotiations leading up to execution of the lease and the intent of all ambiguous portions of the lease. They also maintain the court abused its discretion in refusing to allow a proffer regarding Smoots' purported testimony. We discern no prejudice from the refusal to admit the proffer.

Admittedly, the proposed testimony related to the attorney's understanding of the terms of the lease and the negotiations involved. However, it was the parties' understanding, not their attorney's, at issue in this case. At any rate, Mr. Smoot was allowed to testify to some extent concerning the terms of the lease. He testified the Lease Agreement was to include a portion of the building, the underlying land, and the parking area. He stated "I remember highlighted in yellow, descriptions of the property which were included in the lease."[4] Furthermore, the landlords' witness had already offered testimony concerning the negotiations of the parties and his understanding of the disputed terms of the lease.

---

[3] We also note there is evidence to sustain the landlords' interpretation of the lease.

[4] The highlighted lease was placed in evidence.

It is well settled that any error in the exclusion of evidence which is already in the record from another source is harmless error. *Smith v. Winningham,* 252 S.C. 462, 166 S.E. (2d) 825 (1969); *State Auto Insurance Co. v. Stuart,* 287 S.C. 235, 337 S.E. (2d) 698 (Ct. App. 1985). Since the same evidence concerning the prior negotiations and the intent of the parties had already been admitted through another witness, no prejudice and, therefore, no reversible error can be shown from the refusal to admit the same evidence from the landlords' attorney. *Id.*

### III.

Landlords also argue the court erred by not ordering tenants to pay a pro rata share of expenses related to the fire alarm monitoring and freeze protection systems. We disagree.

The court concluded that "By the plain and express language of Schedule 'C' to the lease, the only 'utilities' which are to be pro-rated are irrigation water, electrical utilities and water and sewer."

Landlords claim the court erred in relying solely on Schedule "C" and failing to consider the first part of Article 3 which requires the tenant to pay "other such services including installation or like charges . . . which may be furnished to or used by Tenant in or about the Property." Landlords argue that the freeze protection system and fire alarm monitoring system are "other services" used by tenants in or about the property.

Landlords' argument, however, contradicts the allegations in their complaint and their application for eviction. Paragraph 10 of the Complaint, and paragraph 6 of the application for eviction state the following:

> That in accordance with the terms and conditions of the Lease Agreement, Defendants also agreed to pay a pro rata portion of the cost of utilities and other services furnished or used by the Defendants in or about the leased property. *Exhibit "C" to said Lease sets forth the agreed-upon pro rata share of these utility and service costs."*

(Emphasis added.)

In *Postal v. Mann,* ___ S.C. ___, 418 S.E. (2d) 322 (Ct. App. 1992), this court stated the general rule regarding arguments which contradict a party's pleadings:

> It is well settled that parties are judicially bound by their pleadings unless withdrawn, altered or stricken by amendment or otherwise. The allegations, statements, or admissions contained in a pleading are conclusive as against the pleader and a party cannot subsequently take a position contradictory of, or inconsistent with, his pleadings and facts which are admitted by the pleadings are taken as true against the pleader for the purpose of the action. *Elrod v. All,* 243 S.C. 425, 134, S. E. (2d) 410 (1964).

418 S.E. (2d) at 323. Following the rule cited in *Postal* and *Elrod,* we hold the court did not err by relying on Exhibit "C" to determine the fire alarm monitoring and freeze protection systems were not "utilities" as defined in the leases.

## IV.

In February 1991, the building which contains the demised premises sustained freeze damage. Two joints in the water sprinkler system burst causing an insurable loss. Landlords claimed that tenants owed $666.00 which represented the pro rata portion of a $1,000.00 insurance deductible paid by the landlord for water damage to the building. The court held that under the terms of the lease, landlord was required to indemnify or hold tenants harmless from costs or damages which arose from landlords' acts or omissions, negligent or otherwise. The court concluded that the water damage was the direct result of Landlords' acts or omissions and, therefore, tenants were not required to pay a pro rata share of the insurance deductible.

After reviewing the Record, we find it contains sufficient evidence to support the court's finding that the water damage was the direct result of landlords' acts or omissions and, therefore, under the terms of the lease, tenants were not required to pay a pro rata share of the insurance deductible.

## V.

Finally, the landlords assign as error the court's finding that the August 1990 rent was forgiven, and that the obligation to pay rent commenced on September 1, 1990. Instead, they argue the tenants breached their lease by failing to pay one month's "minimum rent" during the first year of the lease.

Article 1 of the lease agreement states the initial term of the lease began August 1, 1990 and terminated December 31, 1992. Article 2 of the lease agreement provides that the minimum rent payments commenced on September 1, 1990 and would be $40,000 per year on schedule as shown in Exhibit "D." Schedule "D" provided, in pertinent part:

> ... For the initial 12-month period the percentage of the annual minimum rent paid will be as follows.

| $40,000 per annum | | |
|---|---|---|
| August 1990 | 0% | 0% |
| September 1990 | 11% | $4,400 |
| October 1990 | 8% | $3,200 |
| November 1990 | 9% | $3,600 |
| December 1990 | 6% | $2,400 |
| January 1991 | 4% | $1,600 |
| February 1991 | 3% | $1,200 |
| March 1991 | 5% | $2,000 |
| April 1991 | 6% | $3,200 |
| May 1991 | 12% | $4,800 |
| June 1991 | 11% | $4,400 |
| July 1991 | 11% | $4,400 |

Thus, the issue was whether the year in which the first $40,000.00 was to be paid began on August 1, 1990, or on September 1, 1990. The court concluded that the "clear and unambiguous language" of the lease indicated rent payments began on September 1, 1990, and therefore, the year in which $40,000.00 was due began on that date (September 1, 1990) and ended on August 31, 1991. The court concluded that, in effect, the rent for the month of August 1990 was forgiven as tenants indicated in their testimony. We find there is evidence in the record which supports this conclusion, and we, therefore, affirm the trial court.

The lease specifically states the rent was to begin on September 1, 1990. There is no indication in the lease the August 1990 rent was to be "made up" before August 1991. Landlords argue that Schedule "D" indicates the year in which the $40,000.00 was to be paid began on August 1, 1990. Moreover, if the figures in the right-hand column of Schedule "D" are added, they total only $35,200. This, they argue, indicates that at least one more month's rent is needed to meet the $40,000.00 per annum requirement. The court found that tenants paid $4,800.00 in August 1991, thus totaling $40,000.00 for the period commencing September 1, 1990 and ending on August 31, 1991. As the court stated, "This is in complete accord with the express terms of the lease, which provides for a minimum rent of $40,000.00 per year, commencing on September 2, 1990."

## VI.

Landlords argue the court erred in awarding tenants attorney fees and costs. We disagree.

Article 12 of the lease agreement provides in part as follows:

> In the event of any litigation arising out of enforcement of this Lease, the prevailing party in such litigation shall be entitled to recover of [sic] all costs, including reasonable attorneys' fees from the nonprevailing part.

We hold that the tenants are the prevailing party and are entitled to recover their costs and attorney fees.

Affirmed.

HOWELL, C.J., and GOOLSBY, J., concur.